# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO
**Judge Daniel D. Domenico**

Case No. 1:19-cr-00378-DDD

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ARISTEO ROACHO, JR.

    Defendant.

## ORDER DENYING MOTION TO SUPPRESS

In this criminal case, officers coordinating with a confidential source of information set up a drug deal involving Defendant Aristeo Roacho, Jr. to take place at a certain time and location. Mr. Roacho was ultimately arrested, and the subsequent search of his vehicle uncovered three pounds of methamphetamine and two small bags of cocaine. Mr. Roacho now moves to suppress the drugs from evidence. (Doc. 22.) For the following reasons, the motion is **DENIED**.

## PROCEDURAL HISTORY

On August 7, 2019, the government filed a one-count Complaint against Mr. Roacho alleging that he possessed with intent to distribute 500 grams and more of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii). On August 21, 2019, the government filed a two-count Indictment containing the allegation from the complaint, as well as a violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), possession with intent to distribute cocaine, and a forfeiture allegation.

On October 30, 2019, Mr. Roacho filed this motion to suppress. (Doc. 22.) The Court held an evidentiary hearing on December 3, and at Mr. Roacho's counsel's request, continued the hearing on December 20 so she could review recently received discovery.

## BACKGROUND

The facts are taken from the testimony given at the evidentiary hearing, along with documents entered into evidence and filed on the record, including several videotapes. The relevant events all took place on August 5, 2019.

The source of information was caught in possession of methamphetamine, heroin, cocaine, and firearms. Then, during a recorded interview at a police station, he told agents the names of people he claimed sold drugs and that he had recently bought cocaine from an individual known to him only as "Junebug." He showed agents several text messages sent from Junebug in which the two discussed drug deals. He stated that Junebug drove "a Dodge truck" that was "silver or white."

Before the interview with the source, the agents had been aware of Mr. Roacho, who they believed used the nickname Junebug. They searched the Colorado Springs Police Department's database and learned that Mr. Roacho was a convicted felon and gang member. They also found that he owned a gray 2012 Dodge Durango SUV. They retrieved a booking photo of Mr. Roacho and showed it to the source without a name attached, and the source identified the man in the photo as Junebug. At the suggestion of the agents, and while they watched and listened, the source then set up a drug deal for methamphetamine[1] with

---

[1] The source recently had purchased several large quantities of heroin from Junebug. The source also recently purchased cocaine from Junebug. FBI Agent Cohen testified that they were going to set up the

Mr. Roacho over the phone. The two negotiated a price over text ($7,600 for three pounds), and Mr. Roacho called the source to arrange a location (a parking lot at 900 East Fillmore in Colorado Springs).

While the FBI agents remained with the source at the police station, Colorado Springs Police Department ("CSPD") officers gathered in "jump teams" in unmarked vehicles near the location the source and Junebug had agreed upon, and began conducting surveillance.[2] At approximately 7:20 p.m., law enforcement officers identified Mr. Roacho in the area driving a gray Dodge Durango.[3] Mr. Roacho made some circles around the parking lot, looking around and checking the area, before parking. After a few minutes, he drove out of the lot without having exited the vehicle.

Mr. Roacho then headed westbound on 1st Street. CSPD Sergeant Bauer, who was driving an unmarked SUV with his "jump" team, was travelling westbound on East Fillmore Street. FBI Agent Cohen called Sergeant Bauer and told him that they were sure it was Mr. Roacho in the Durango and that they should go ahead and stop him. Sergeant

---

deal for methamphetamine because "it didn't make sense he would have been able to sell all that cocaine between the time of purchase and the date of his arrest."

[2] Agent Cohen asked the CSPD tactical task force to assist in the apprehension of a suspect.

[3] The license plate of that gray Dodge had been queried through the police systems, and it was found that the registered owner of that vehicle was Mr. Roacho. Officers on the scene also radioed that the individual driving the gray Dodge was most likely Mr. Roacho based on the physical description they had received and what they could view from the parking lot.

Bauer then turned northbound on Arcadia Street. He intended to perform a "soft block" by pulling in front of Mr. Roacho without making physical contact.

The parties disagree about what happened next. Sergeant Bauer testified that, as he approached the intersection of 1st and Arcadia, he made a wide turn to get in front of Mr. Roacho, but Mr. Roacho slowed down, stopped, and then accelerated quickly and hit the sergeant's car. Sergeant Bauer testified that Mr. Roacho and his passenger looked like they were having fun and had smiles on their faces. By contrast, Mr. Roacho contends that he came to a stop and the deputy hit him head on.[4]

Either way, Mr. Roacho then reversed and started to pull around the sergeant's SUV, but the sergeant turned and drove his front bumper into the rear wheel area of the Durango and pushed it up on a curb, pinning it next to a utility pole. Officers then got out of the SUV and arrested Mr. Roacho and his two passengers. Under both parties' versions of the events, Mr. Roacho's and Sergeant Bauer's vehicles made contact twice—about ten second apart—and Sergeant Bauer never activated his police lights or sirens.

A canine unit then arrived and alerted to drugs in Mr. Roacho's Durango. The police applied for, and received, a state vehicle search warrant for the Durango, where they found three pounds of methamphetamine and a smaller amount of cocaine.

---

[4] He supports this with reference to Sergeant Bauer's body camera footage, which, viewed in isolation, does not confirm his story.

## ANALYSIS

Mr. Roacho argues that the drugs obtained during the search of his Durango must be suppressed. Specifically, he argues:

> The officers violated Mr. Roacho's constitutional rights on three distinct occasions. First, the officers had no legal basis to stop Mr. Roacho, even for a detention stop, as the [source]'s information was insufficient to create a reasonable suspicion that Mr. Roacho had committed, or was committing, a crime. Second, the officers illegally seized Mr. Roacho when they crashed into him head-on as he was preparing to stop at a stop sign. And, third, the officers committed another unlawful seizure when they T-boned Mr. Roacho's Durango and pinned it between the police SUV and a utility pole. Because the evidence in the case—specifically the methamphetamine and cocaine—was only obtained as a result of this illegal conduct, Mr. Roacho respectfully requests that this Court suppress it.

After obtaining additional discovery from the government, including a videotape of the source's interview with officers, Mr. Roacho filed a supplement to his motion to suppress, arguing that the affidavit submitted in support of the search warrant recklessly disregarded the source's statements regarding Junebug's vehicle and rephrased them to be more in line with the vehicle Mr. Roacho drove. He argues this is a violation of *Franks v. Delaware*, 438 U.S. 154 (1978).

The government responds by contending that (1) officers had probable cause to arrest Mr. Roacho for drug crimes before encountering him on August 5, 2019; (2) officers had probable cause to arrest him for several state charges on August 5, 2019 after Mr. Roacho rammed Sergeant Bauer's police vehicle; (3) officers would have inevitably discovered the methamphetamine and cocaine in the defendant's vehicle; and (4) the state vehicle search warrant affidavit established probable cause to search the defendant's vehicle. The government argues the alleged

discrepancies between the source's interview and the content of the warrant affidavit fail to raise any material issues.

### 1. Probable Cause

The Court agrees with the government that officers had probable cause to arrest Mr. Roacho before and throughout their encounter with him. Though precisely when Mr. Roacho was "seized" for Fourth Amendment purposes is somewhat ambiguous, *see Brower v. Cty. of Inyo*, 489 U.S. 593, 596–97 (1989), that question need not be resolved here.

The "question whether probable cause exist[s] in light of the—so defined—factual record does not require proof beyond reasonable doubt. It does not even require the suspect's guilt to be more likely true than false. Instead, the relevant question is whether a 'substantial probability' existed that the suspect committed the crime." *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011) (internal citations omitted); *see also Illinois v. Gates*, 462 U.S. 213, 214 (1983) (Probable cause is a "fair probability that contraband or evidence of a crime will be found in a particular place."). This is a case-specific determination. Reviewing courts should consider the totality of the circumstances, including, in a case involving an informant, the informant's veracity, reliability, and the basis of his knowledge. *Gates*, 462 U.S. at 214.

Here, Mr. Roacho questions the reliability and sufficiency of the source's information, which he says couldn't support more than an officer's "hunch" that he had drugs. But the record shows that the officers had plentiful reasons to believe the source and verified much of it before making the arrest. According to Agent Cohen and the affidavit submitted in support of the vehicle search warrant, the source was familiar with many different types of illegal drugs, the tradecraft of large-volume drug dealers, the street prices of drugs, and the equipment used in drug

sales. The source identified phone numbers as belonging to other drug-supply sources, and those phone numbers linked to open drug investigations. The source also showed law enforcement text messages from several prior transactions with Junebug and was familiar with Junebug's vehicle and appearance—with which agents were able to identify Junebug as Mr. Roacho. The source was only corroborating what the agents already knew: Mr. Roacho was a drug dealer and drove a specific vehicle.

Agent Cohen and the affidavit further affirm that the source informed investigators that Junebug would be at a certain location, at a certain time, with illegal drugs. The later-filed affidavit does not detail how the source knew this information, though the basis for this belief is well-documented. At the direction of FBI agents, and as they watched and listened, the source set up a drug deal with Mr. Roacho over the phone. As Agent Cohen testified:

> A. I believe Mr. Roacho is the one that called the source of information. I don't have logs of those incoming and outgoing telephone calls in front of me. There was a telephone call placed on where they were to meet.
>
> Q. Where were they to meet for this drug deal?
>
> A. At the O'Furry's bar, approximately 900 East Fillmore in Colorado Springs.

(Doc. 54, at 28:24–29:5.) The specifics of the deal—quantity, location, price, and timing—were made definite through these communications.[5] Through this exchange, the source provided agents with information

---

[5] The text messages contain price negotiations for "water," which Agent Cohen testified was a code for methamphetamine, for example: Q: "What them water lookin like" A: "nice 26" Q: "Can u do 25 on em tho if I do 3" A: "I'll do it for 76" Q: "That's ku where u want me."

enough for them to believe it was substantially probable that Mr. Roacho was going to bring drugs to sell to a specific location at a specific time.

Mr. Roacho does not seriously dispute that, if believed, this information was adequate to give the officers probable cause to believe he was committing a crime. Instead, he gives four reasons the source should not have been believed. First, he points out that the source was providing information in the hope that it would help mitigate likely consequences of his own criminal activity. *See United States v. Avery*, 295 F.3d 1158, 1168 (10th Cir. 2002) ("Second, magistrate judges, courts have observed, often know, even without an explicit discussion of criminal history, that many confidential informants suffer from generally unsavory character and may only be assisting police to avoid prosecution for their own crimes." (internal citation removed). This is undoubtedly true. And in some circumstances the benefits potentially flowing to confidential sources can be a reason to question the source's veracity—though not necessarily sufficient to disregard it entirely. *See, e.g.*, *United States v. Morin*, 188 F. App'x 709, 712 (10th Cir. 2006) (An "affidavit informed the state court judge Granger had purchased methamphetamine from Morin in the past. Combined with the judge's presumed background knowledge about confidential informants, the information in the affidavit was sufficient to alert the court Granger was a drug user who may have been cooperating with police for self-serving reasons.").

But in these circumstances, where the source was predicting what the target would do in the near future, not blaming the target for some past crime, the incentive works in the opposite direction: to bolster the source's credibility. If the source was motivated by a possible deal—contingent on helpful, veracious information—he had a strong incentive to tell the truth. Where the information provided by a source is easily and quickly testable, it is only "self-serving" to provide accurate information.

Mr. Roacho also argues that the Court should treat the source as less credible because he was a member of a rival gang and would have had animosity toward Mr. Roacho. This is similarly unpersuasive. For one thing, as Agent Cohen testified, the source and Junebug, whatever their different gang affiliations, had sold drugs to one another on a number of occasions before. There may be no honor among thieves, but apparently, there is at least shared economic interest among drug-dealing gang members. In addition, even if he had animosity toward Junebug, the source had no incentive to lie about whether he would have drugs on him; pointing to an innocent man, as noted above, would have ruined his hopes of a lenient deal, and it would not do any significant harm to a rival gang-member. Nor is there evidence of coercion or animus in the communications between the source and Mr. Roacho. In fact, the video interview between the source and FBI agents reflects that the source was initially reluctant to set up the deal (and, thus, assist in Mr. Roacho's arrest). (*See* Doc. 60, at 1:27–1:30.)

Mr. Roacho contends that the source's identification of him was tainted because agents only showed him a booking photo of Mr. Roacho. It is true that this might be inadequate if this were a witness identification case and the circumstances were impermissibly suggestive. *United States v. Sanchez*, 24 F.3d 1259, 1261 (10th Cir. 1994). But this was not a lineup asking the source to decide who had committed the crime; it was an effort to make sure two aliases, Roacho and Junebug, corresponded to the same person. Had the suggestive power of using only Mr. Roacho's photo caused the source to identify Mr. Roacho when Junebug was actually someone else, then that other Junebug, not Mr. Roacho, would have arrived in precisely the agreed upon place at the agreed upon time.

Mr. Roacho also submits that the source is less credible because of the source's own criminal history. This argument is unconvincing, particularly because it was the source's criminal proclivity that made his ability to arrange the drug deal with Mr. Roacho possible. This is hardly unusual for confidential sources, and while it is not irrelevant, under the totality of the circumstances it does not overcome the many factors supporting probable cause. *See Avery*, 295 F.3d at 1168; *Morin*, 188 F. App'x at 712. Mr. Roacho says officers did not adequately account for the possibility that the source was under the influence of drugs at the time he was relaying information to them. This is not consistent with the record. Agent Castro and others had significant experience with individuals who were under the influence and did not believe the source to be so. The videotaped interview does not suggest any impairment.

Finally, Mr. Roacho argues that the discrepancy between the source's description of Junebug's vehicle and the actual vehicle driven by Mr. Roacho should have undermined any belief in the source. The Court disagrees. The source stated that Junebug drove "a Dodge truck" that was "silver or white." Then Agent Cohen, not the source, asked whether Mr. Roacho "still had a Dodge Ram," which is a pickup truck, and the source agreed. As it turned out, Mr. Roacho drove a gray Dodge Durango SUV.

None of these minor discrepancies is material enough to undermine the source's credibility. Notably, many people in common parlance either do not distinguish between trucks and SUVs or consider SUVs to be a sub-class of trucks. *Carani v. Meisner*, No. 08-CV-02626-MSK-CBS, 2010 WL 3023805, at *5 (D. Colo. July 30, 2010) ("Mr. Lindquist, who corroborated that a woman driving a truck or SUV drove by . . . "); *Moody v. Ford Motor Co.*, 506 F. Supp. 2d 823, 833 (N.D. Okla. 2007)

("This accident and the other 273,000 light truck/SUV rollovers that occur in America are not very violent."); *Warner v. Ford Motor Co.*, No. CIVA06CV02443-JLK-MEH, 2008 WL 4452338, at *4 (D. Colo. Sept. 30, 2008) ("When Ford began to design light trucks and SUVs in the late 1980's . . . ); *United States v. Jarrett*, 999 F. Supp. 2d 828, 832 (W.D. Pa. 2014) ("The wanted poster stated that Defendant had been last seen in a black SUV or truck."). And it was not, as Mr. Roacho has argued, the source who "expressly stated that Mr. Roacho drove a Dodge Ram pickup." (Doc. 53, at 7.)  It was Agent Cohen who suggested it, and the source simply agreed. That neither the source nor Agent Cohen were certain about the precise models in the Dodge product line does not undermine the overall credibility of the information. Likewise, the differences between gray and silver do not strike the Court as significant in this regard. The source accurately described Mr. Roacho's vehicle, although in a slightly general manner, and was only somewhat incorrect in agreeing with the agent. In the minds of the agents, though, there would have been no reason to doubt the source's veracity on this point.

The totality of the circumstances surrounding the source's information supports Agent Cohen's testimony that he was credible. He provided detailed and provable information, much of which was either consistent with information already known or was verified prior to the stop. The source had no reason to lie, and in fact had significant incentives to provide law enforcement with accurate and useful information. There was at least a substantial probability—based on the information provided by the source and coupled with the other information already known about Mr. Roacho—that when Mr. Roacho pulled into the arranged meeting place, he possessed significant amounts of illegal narcotics. Officers possessed probable cause to make an arrest.

**2. Excessive Force**

Mr. Roacho contends that even if they had adequate cause to stop him, officers violated his rights by crashing into him (1) as he was preparing to stop at a stop sign, and (2) again as he moved to pull around Sergeant Bauer. The parties sharply dispute whether in fact this is what happened, or whether, as the government contends, it was Mr. Roacho who crashed into Sergeant Bauer's vehicle. As noted below, neither of the collisions amounts to unconstitutionally excessive force in these circumstances[6] and any subsequently-discovered evidence would not necessarily be suppressible as fruit of the poisonous tree.[7]

The relevant evidence includes the testimony of Sergeant Bauer, as well as his body-worn camera videotapes, and Sergeant Donovan, a police canine handler. Sergeant Bauer testified he intended to turn the corner and drive in front of Mr. Roacho's Dodge, but not hit him, in a maneuver called a "soft block." Normally, another police vehicle would have been just behind Mr. Roacho, but in this case that vehicle was further behind than anticipated. The sergeant testified that as he rounded

---

[6]   *See Brooks v. Gaenzle*, 614 F.3d 1213, 1216 (10th Cir. 2010) (no excessive force without immobilizing seizure); *see also, e.g.*, *United States v. Varela*, No. CR-06-1022 RB, 2006 WL 8440690, at *8 (D.N.M. Oct. 13, 2006) ("Recognizing that excessive force claims require careful attention to the facts and circumstances of each particular case, including the *severity of the crime at issue*, whether the suspect poses an *immediate threat to the safety of the officers or others*, and whether he is *actively resisting arrest* or attempting to evade arrest by flight, this Court has little difficulty in concluding that no excessive force was employed during Varela's arrest on January 11, 2006." (quotation omitted)).

[7]   "To suppress evidence as the fruit of [an] unlawful detention, [the defendant] must make two showings: [i] that the detention did violate his Fourth Amendment rights; and [ii] that there is a factual nexus between the illegality and the challenged evidence." *United States v. DeLuca,* 269 F.3d 1128, 1132 (10th Cir. 2001) (internal quotations omitted).

the corner, the Dodge drove directly into him.[8] He testified that the occupants of the other vehicle were looking directly at him and appeared to be laughing.

The defense emphasizes that Sergeant Bauer's vehicle was unmarked, had tinted windows, and that the officers did not have "Police" or other identifying information displayed in a way that would have been visible to Roacho. The defense also points to the testimony of Mr. Roacho's brother, Diego, who was a passenger in the Dodge. He testified that the Dodge was slowing to the stop sign when it was suddenly struck by what turned out to be an unmarked police vehicle. He denied that any of them were laughing and said he was surprised and that they had no warning or idea that it was a police vehicle.

The Court finds that Sergeant Bauer did not intentionally cause the initial collision. First, Sergeant Bauer's testimony on that point is credible. While certain aspects of the video evidence are inconclusive (such as precisely where on the road the collision occurred, and whether someone looking in could have recognized the occupants as law enforcement), it is largely consistent with his testimony and the report of Officer Waters. It shows Sergeant Bauer getting the go-ahead to make the stop, beginning to drive to the designated spot, then colorfully expressing his surprise when the trail vehicle is not as close as expected. The collision occurs at or near the end of his turn, and, while not terribly violent, it was strong enough to shut off the engine of Sergeant Bauer's vehicle. Notably, at no time does Sergeant Bauer tell those in his vehicle

---

[8] This is consistent with the report of Officer Matthew Waters, who wrote: "Mr. Roacho attempted to hit Sgt. Bauer's vehicle with his (Mr. Roacho's) vehicle." (Doc. 22-2, at 13.)

that he's going to crash into Mr. Roacho or warn them to brace themselves. Second, the defense did not significantly undermine this testimony and evidence. Even if, as he testified, Diego Roacho was not texting at the time of the collision (though he had been just before), he would, as a passenger, have naturally been less attentive to the surroundings, including approaching vehicles. So, while the Court does not disbelieve Diego's testimony, it does discount it somewhat.

More importantly, nearly all the defense argument on this point is focused on explaining that Mr. Roacho would not have known it was a law enforcement vehicle approaching him and thus would have had no reason to strike the vehicle as part of an attempt to drive away. This, however, is undermined by several facts, including that Mr. Roacho was in possession of significant amounts of narcotics and, since the source did not show up at the agreed time and place, he likely suspected he had been set up. The government supplied testimony that their targets often know what kinds of vehicles law enforcement teams drive, and such a vehicle drove in front of Mr. Roacho moments after his planned drug deal failed to transpire. Mr. Roacho very well could have known or at least suspected what was happening. Based on the entirety of the evidence, the Court is persuaded that Mr. Roacho caused the initial collision. It therefore could not be excessive force on the part of Sergeant Bauer.

As for the second collision, the government acknowledges that Sergeant Bauer intentionally pushed Mr. Roacho's vehicle onto the curb and disabled it. Mr. Roacho does not dispute that, after the first impact, he drove around the police SUV to leave. He argues that this was not an attempt to evade arrest, but merely the natural response of someone who had been driven into. The Court has already found that Mr. Roacho

likely knew that it was a law enforcement vehicle before the initial collision, and that he was, at that point, evading arrest. So, officers then had probable cause to arrest him for several state offenses. *See, e.g.*, Colo. Rev. Stat. § 18-8-104(1)(a) (obstructing a peace officer); Colo. Rev. Stat. § 18-3-206 (menacing); Colo. Rev. Stat. § 18-4-501 (criminal mischief). In fact, leaving the scene of *any* accident, irrespective of whether it involves police, is a crime. Colo. Rev. Stat. §§ 42-4-1601, 42-4-1602 (misdemeanor and felony provisions governing leaving the scene of an accident); *see also United States v. Bailey*, 691 F.2d 1009, 1017 (11th Cir. 1982) (Where "the defendant's response [to police misconduct] is itself a new, distinct crime, there are strong policy reasons for permitting the police to arrest him for that crime.").

Even so, Mr. Roacho argues that this second crash involved constitutionally excessive, even "deadly," force. (Doc. 34, at 6.) To determine the reasonableness of a seizure, courts "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Scott v. Harris*, 550 U.S. 372, 383 (2007) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). Proper application of this standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

The facts and circumstances here do not support Mr. Roacho's contention that this amount of force was excessive. Sergeant Bauer was reasonable in fearing that Mr. Roacho posed an immediate threat to the safety of the officers or others. He had, as the court found above, already

crashed into a law enforcement vehicle. He was, as he has conceded, attempting to leave the scene. Sergeant Bauer testified that he knew Mr. Roacho was likely headed towards a busy thoroughfare, where any attempt to stop him would have been infinitely more dangerous.[9] Coupled with Mr. Roacho's known criminal past, the source's information, and because he was suspected of carrying a large quantity of drugs, it was reasonable for the officers to think Mr. Roacho was armed and dangerous.[10] The incident also took place near a residential neighborhood, and Mr. Roacho was attempting to flee. Sergeant Bauer's conclusion that disabling the vehicle with his own was the safest option for stopping Mr. Roacho is not unreasonable.

Further, while an intentional car crash certainly can amount to deadly force, having reviewed the evidence, there is no indication that the second, intentional collision here "create[d] a substantial likelihood of causing death or serious bodily injury" to anyone. *Scott*, 550 U.S. at 382 (assuming, without deciding, or expressly adopting that test, that officers had used deadly force). Both vehicles were moving at relatively

---

[9] As Sergeant Bauer explained, "I just felt at that point they warned me he was going to flee, run. By striking me and going on the wrong side of the road to get out of there, I was afraid this would turn into some kind of pursuit with the officers involved. We're in a residential neighborhood back there. One left turn and we're out on a major thoroughfare, which is Fillmore Road, and I knew if this vehicle traveled at a high rate of speed, the chance of citizens getting into this would increase greatly." (Doc. 54, at 67:14–22.)

[10] Sergeant Bauer also testified that "Agent Cohen told me that they were dealing with a suspect, which was Mr. Roacho at that time. They said that they had a confidential informant that arranged for 3 pounds of methamphetamine to be delivered. The informant believed Mr. Roacho would be armed with a firearm, and Mr. Roacho had an extensive criminal past and was to be considered armed and dangerous by us and would most likely flee when he saw the police." (Doc. 54, at 59:8–15.)

low speeds, the Durango's airbags did not deploy, and everyone walked away without serious injury—though one passenger complained that his arm hurt. The videos show minor to moderate damage to the vehicles (which was at least partly the result of the initial, higher speed collision). Considering the severity of the crimes at issue, the Court's finding that Mr. Roacho posed an immediate threat to the safety of the officers and others, and that he was actively resisting arrest or attempting to evade arrest by flight, this use of force was reasonable under the circumstances.

### 3. Sufficiency of the Search Warrant

Mr. Roacho concludes by arguing that, absent the evidence obtained as a result of the officers' allegedly illegal conduct, there is insufficient information to sustain the state magistrate judge's probable cause finding. He submits that three categories of facts should be excised from the warrant affidavit: (1) the information provided to the officers by the source; (2) that, despite no emergency lights being activated, Mr. Roacho recognized the people in the unmarked SUV as police and he attempted to flee the scene after being struck the first time; and (3) the positive alert from the drug dog.

Beginning with the first, the Court has already explained why the source's information was sufficient to establish probable cause and could be reasonably relied upon by the officers. But Mr. Roacho also argues that the source's identification of his car, at least as it is described in the search warrant, is falsely represented and violates *Franks v. Delaware*, 438 U.S. 154 (1978).[11] To establish a *Franks* violation, a defendant must

---

[11] Mr. Roacho did not specifically request that the Court hold any hearing in addition to the hearing it held on his motion to suppress, to determine the *Franks* issue.

"demonstrate the affidavit's falsity or reckless disregard for the truth by a preponderance of the evidence." *United States v. Tisdale*, 248 F.3d 964, 973 (10th Cir. 2001). The affidavit used to support the search warrant, submitted by Detective Gulbrandson, states that the source believed Junebug "drives a grey/silver Dodge, but believed it to be a pickup truck." (Doc. 22-3, at 4.) As Mr. Roacho argues, the source did not mention the color "gray" in the interview with law enforcement. Mr. Roacho further argues that the source "expressly stated that Mr. Roacho drove a Dodge Ram pickup." (Doc. 53, at 7.) These arguments misrepresent what was said during the interview, which the Court has recounted above. And the distinctions between gray and silver, and a Ram "truck" or an SUV are not enough for Mr. Roacho to meet his burden to show falsity or reckless disregard for the truth. There was no reason for the court to not consider this information.

Second, as noted above, the evidence of Mr. Roacho's flight was not unconstitutionally obtained. The Court is convinced Mr. Roacho knew who he had just run into, certainly by the time he began to drive away,[12] and his attempt to leave the scene of an accident—whether or not it involved police—was an independent crime. The police also did not use excessive force.

Finally, the positive alert from the drug dog is not fruit of the poisonous tree. "To suppress evidence as the fruit of [an] unlawful detention, [the defendant] must make two showings: [i] that the detention did violate his Fourth Amendment rights; and [ii] that there is a factual nexus between the illegality and the challenged evidence." *United*

---

[12] Indeed, by that time, the video evidence suggests that the trailing law enforcement vehicle had approached and had its lights activated.

*States v. DeLuca,* 269 F.3d 1128, 1132 (10th Cir. 2001) (internal quotations omitted). Mr. Roacho has made neither showing. Nor has he undermined, by cross examination or written argument, the procedural accuracy of the subsequent canine alert. Sergeant Donovan's canine partner is certified to detect cocaine or crack, heroin, methamphetamine, and MDMA. The dog gave three positive alerts on the Durango.

## CONCLUSION

Officers had probable cause to arrest Mr. Roacho before encountering him on August 5, 2019. They also had independent probable cause to seize him after he collided with a police vehicle. And neither collision amounted to excessive force. The positive alert of drugs from the canine unit was not fruit of the poisonous tree. The Court will not excise any material from the search warrant affidavit, which established probable cause to search the Durango. The evidence retrieved was legally obtained. Mr. Roacho's motion to suppress (Doc. 22) is **DENIED**.

Dated: January 17, 2020.

BY THE COURT:

Daniel D. Domenico
United States District Judge